UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **WESTERNGECO L.L.C.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Case No. 4:09-cv-1827** |
| | § | |
| **ION GEOPHYSICAL CORPORATION,** | § | |
| **et al.** | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM AND ORDER**

Pending before the Court are: (1) WesternGeco's Motion for Partial Reconsideration Regarding EEZ (Doc. No. 149); (2) Motion to Dismiss WesternGeco's Amended Complaint by the Fugro Defendants Pursuant to Rule 12(b)(6) (Doc. No. 148); (3) WesternGeco's Motion to Strike Fugro's Second Motion to Dismiss and for an Expedited Response (Doc. No. 150); and (4) WesternGeco's Motion to Compel Fugro's Initial Disclosures, Discovery and Answer (Doc. No. 163).

Upon considering the Motions, all responses thereto, and the applicable law, the Court finds that WesternGeco's Motion for Partial Reconsideration Regarding EEZ (Doc. No. 149) must be denied, the Motion to Dismiss WesternGeco's Amended Complaint by the Fugro Defendants Pursuant to Rule 12(b)(6) (Doc. No. 148) must be granted in part and denied in part, WesternGeco's Motion to Strike Fugro's Second Motion to Dismiss and For an Expedited Response (Doc. No. 150) must be denied, and WesternGeco's Motion to Compel Fugro's Initial Disclosures, Discovery and Answer (Doc. No. 163) must be denied as moot.

## I.       BACKGROUND

This is a patent infringement case originally brought by WesternGeco L.L.C. ("Plaintiff" or "WesternGeco") against Ion Geophysical Corporation ("Ion") in 2009. WesternGeco alleges that Ion has infringed on five of its U.S. patents—U.S. Patent No. 6,932,017 (the "'017 Patent"), 7,080,607 (the "'607 Patent"), 7,162,967 (the "'967 Patent"), and 7,293,520 (the "'520 Patent") ("Bittleston Patents" collectively); and U.S. Patent. No. 6,691,038 (the "'038 Patent" or "Zajac Patent").

In June 2010, WesternGeco separately filed suit against the following six entities: (1) Fugro-Geoteam, Inc.; (2) Fugro, Inc.; (3) Fugro (USA), Inc.; (4) Fugro Geoservices, Inc.; (5) Fugro-Geoteam AS; and (6) Fugro Norway Marine Services. (Case No. 4:10-cv-2120). For purposes of these motions, the following four entities will be referred to as the "Fugro US Defendants": (1) Fugro-Geoteam, Inc.; (2) Fugro, Inc.; (3) Fugro (USA), Inc.; (4) Fugro Geoservices, Inc. The entities Fugro-Geoteam AS and Fugro Norway Marine Services will be referred to as the "Fugro Norway Defendants." When referring to all six entities, we will use the term the "Fugro Defendants." The case brought by WesternGeco against the Fugro Defendants was consolidated with WesternGeco's suit against Ion.

At issue in this case is marine seismic streamer technology that is deployed behind ships. These streamers, essentially long cables, use acoustic signals and sensors to create three-dimensional maps of the subsurface of the ocean floor in order to facilitate natural resource exploration and management. For many seismic studies, greater control over the depth and lateral position of streamers is important in order to achieve optimal imagery from the signals and to maneuver around impediments such as rocks and oil rigs. WesternGeco's patents all

pertain to streamer positioning devices, or devices that are used to control the position of a streamer as it is towed.

WesternGeco alleged in its original complaint that the Fugro Defendants, which are companies that conduct marine towed streamer surveys, had contracted with Statoil USA E&P, Inc. ("Statoil") to conduct a three-dimensional (3D) marine seismic survey in the Chukchi Sea, off the coast of Alaska. The area explored was located in the Outer Continental Shelf ("OCS"), approximately 100 miles northwest of Wainwright, Alaska and 150 miles west of Barrow, Alaska. The seismic vessel *Geo Celtic*, owned and operated by the Fugro Norway Defendants, conducted the survey. The *Geo Celtic* towed an array of airgun and hydrophone streamers for data acquisition and utilized Ion's allegedly infringing DigiFIN and Compass Birds or DigiBIRD and/or Orca command and control software for streamer control and streamer positioning. The *Geo Celtic* arrived at Dutch Harbor, Alaska for the load of crew and supplies, before heading to the lease holdings for the seismic survey. Nome was the main port for refueling, resupply and crew changes, with Barrow or Wainwright as backup ports for resupply and crew. After the survey was completed, the *Geo Celtic* demobilized. WesternGeco alleged that both the Fugro US Defendants and the Fugro Norway Defendants offered for sale products and services for use in the Chukchi Sea survey relying, in part, on equipment, services, and/or support provided from the Fugro US Defendants' Houston Office.

WesternGeco filed suit against the Fugro Defendants, alleging that the Chukchi Sea survey and other activities constitute infringement of the same five U.S. patents at issue in its suit against Ion. Specifically, WesternGeco claimed that the Fugro US Defendants and the Fugro Norway Defendants have violated 35 U.S.C. §§ 271(a), (b), (c), and/or (f) by "making, using, offering to sell, selling and/or supplying in or from the United States products and services

3

relating to steerable streamers (including but not limited to products and services incorporating DigiFIN and ORCA) and/or inducing and/or contributing to such conduct . . . ." In addition, WesternGeco claimed that the alleged infringement has been willful, rendering this an exceptional case pursuant to 35 U.S.C. § 285.

The Fugro Defendants filed a motion to dismiss WesternGeco's complaint based on lack of personal jurisdiction and on WesternGeco's failure to state a claim upon which relief could be granted. In a memorandum and order dated March 2, 2011 (the "March 2011 Order"), we denied in large part the Fugro Defendants' motion to dismiss. We held that WesternGeco had established a *prima facie* case of personal jurisdiction over the Fugro Norway Defendants and that its complaint met Rule 8 pleading standards. However, we dismissed WesternGeco's claims of direct infringement under 35 U.S.C. § 271(a) that were based upon the Fugro Defendants' acts located in or upon Statoil's lease holdings in the Chukchi Sea. We found that these activities would occur outside the United States and its territories, and thus were not actionable under U.S. patent law. We granted WesternGeco leave to amend its complaint and to add a request for declaratory judgment under 28 U.S.C. § 2201.

On March 14, 2011, Western Geco filed an amended complaint against the Fugro Defendants (Doc. No. 145). In it, WesternGeco reasserted its allegations against the Fugro Defendants arising out the Chukchi Sea survey. In addition, WesternGeco added allegations regarding the Fugro Defendants' planned marine seismic survey in the Gulf of Mexico.[1] (Am. Compl. ¶¶ 65-74.) Defendant Fugro Geoteam, AS (later, Defendant Fugro Geoteam, Inc.) applied for a permit to conduct a geophysical exploration for mineral resources in the Gulf of Mexico region on behalf of Fugro Multi Client Services, Inc. (a non-party to this case). (Am.

---

[1] For purposes of the motion to dismiss, the Court accepts the factual allegations in WesternGeco's amended complaint as true. *Frame v. City of Arlington*, 575 F.3d 432, 434 (5th Cir. 2009).

Compl. Ex. G.) The Gulf of Mexico survey was to occur between October 1, 2010 and September 31, 2011, but a later amendment changed the period to March 21, 2011 to March 20, 2012. (*Id.* at 2, 31.) The seismic survey vessels conducting the survey would operate from the port of Fourchon, Louisiana. (*Id.* at 31.) The vessels would utilize the allegedly infringing Ion DigiFIN and Compass Birds or DigiBIRD and/or Orca command and control software for streamer control and streamer positioning. WesternGeco sought a declaratory judgment that the Chukchi Sea survey and the Gulf of Mexico survey infringed upon its patents as well as damages for the infringement.

The Fugro Defendants subsequently filed a second motion to dismiss in lieu of an answer. WesternGeco has filed a motion to strike the Fugro Defendants' second motion to dismiss. WesternGeco has also filed a motion to partially reconsider the March 2011 Order. Finally, WesternGeco has filed a motion to compel the Fugro Defendants' initial disclosures, discovery and answer. With the exception of the motion to compel, the motions are briefed and ripe for disposition.

## II.   LEGAL STANDARDS

### A.   Rule 12(b)(6)

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. ---, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).  A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  The plausibility standard is not akin to a "probability requirement," but asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.*  A pleading need not contain detailed factual allegations, but must set forth more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

Ultimately, the question for the court to decide is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. The court must accept well-pleaded facts as true, but legal conclusions are not entitled to the same assumption of truth. *Iqbal*, 129 S. Ct. at 1950 (citation omitted). The court should not "'strain to find inferences favorable to the plaintiffs'" or "accept 'conclusory allegations, unwarranted deductions, or legal conclusions.'" *R2 Investments LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004)). A district court can consider the contents of the pleadings, including attachments thereto, as well as documents attached to the motion, if they are referenced in the plaintiff's complaint and are central to the claims. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 499 (5th Cir. 2000). Furthermore, a court may refer to matters of public record when deciding a motion to dismiss. *Chauhan v. Formosa Plastics Corp.*, 212 F.3d 595, 595 (5th Cir. 2000). Importantly, the court should not evaluate the merits of the allegation, but must satisfy itself only that plaintiff has adequately pled a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). "Motions to dismiss under Rule 12(b)(6) are viewed

with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citation omitted); *Duke Energy Intern., L.L.C. v. Napoli*, Case No. H-09-2408, 2010 WL 3749298, *7 (S.D. Tex. Sept. 21, 2010).

### B.      Rule 59(e)

The Federal Rules of Civil Procedure do not specifically provide for motions for reconsideration. *See Shepherd v. Int'l Paper Co.*, 372 F.3d 326, 328 n.1 (5th Cir. 2004). Reconsideration motions are generally analyzed under the standards for a motion to alter or amend judgment under Rule 59(e) or a motion for relief from a judgment or order under Rule 60(b). *See Hamilton Plaintiffs v. Williams Plaintiffs*, 147 F.3d 367, 371 n. 10 (5th Cir. 1998). Rule 54(b) allows a court to revise an interlocutory order any time prior to the entry of judgment adjudicating all the claims and all the parties' rights and liabilities. A denial of a motion to dismiss is an interlocutory order. Motions for reconsideration from interlocutory orders are governed by the standards for Rule 59(e) motions. *Thakkar v. Balasuriya*, 2009 U.S. Dist. LEXIS 82218, *1 (S.D. Tex. Sept. 9, 2009).

A motion under Rule 59(e) must "clearly establish either a manifest error of law or fact or must present newly discovered evidence." *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005) (citing *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990)). Relief is also appropriate where there has been an intervening change in the controlling law. *See Schiller v. Physicians Resource Group Inc.*, 342 F.3d 563, 567 (5th Cir. 2003). Motions under Rule 59(e) "cannot be used to raise arguments which could, and should, have been made before the judgment issued." *Id.* In considering a motion for reconsideration, a court "must strike the proper balance between two competing imperatives: (1) finality, and (2) the need to render just decisions on the basis of all the facts." *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir. 1993).

III.    ANALYSIS

A.    WesternGeco's Motion for Partial Reconsideration Regarding EEZ

In our March 2011 Order, we addressed the Fugro Defendants' argument that none of WesternGeco's allegations of direct infringement during the Chukchi Sea survey were actionable under U.S. patent law because they occurred outside of the United States. We began from the principle that the "reach of [35 U.S.C.] section 271(a) is limited to infringing activities that occur within the United States," *see MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1376 (Fed. Cir. 2005), and that the Patent Act had defined the term "United States" to include the "United States of America, its territories and possessions." 35 U.S.C. § 100(c). The lease holdings being surveyed were approximately 100 miles off the coast of Alaska, which is within the Outer Continental Shelf ("OCS") and the Exclusive Economic Zone ("EEZ") of the United States. Our analysis of this issue hinged on the legal status of the ocean area upon which the Fugro Defendants' vessels sailed as they conducted the seismic surveys. Under the regime established by the laws of the seas and the relevant Presidential proclamations, the ocean area being traversed is considered both to be high seas and the EEZ of the United States and the seabed area being surveyed is the OCS of the United States.

We held that the Chukchi Sea, when considered as high seas, is not the territory of the United States under well-established principles of international and domestic law. We next held that the Chukchi Sea, when considered as the EEZ of the United States, similarly cannot be the territory of the United States. We reached this holding because language in the Presidential Proclamation recognizing the EEZ also recognized that EEZ was "beyond the territory and the territorial sea of the United States." (March 2011 Order at 37 (quoting Presidential Proclamation No. 5030, Mar. 10, 1983, 48 Fed. Reg. 10605 (1983)). In addition, this Presidential Proclamation

recognized that the United States only possessed limited sovereign rights and jurisdiction over the EEZ. Finally, we were persuaded by the strong judicial reluctance to extend the geographic reach of patent rights without express statutory instruction. As for the Chukchi Sea's status as superjacent to the OCS, we held that governing domestic statutes did not extend the reach of U.S. patent law to apply to the activity of vessels traversing the seas above the OCS for purposes of conducting seismic exploration.

WesternGeco now moves the Court to reconsider whether the EEZ is a "possession" of the United States. WesternGeco argues that, despite clear language in the Presidential Proclamation affirming that the EEZ is not U.S. territory, the EEZ can be a U.S. possession because the term "possessions" is broader than the term "territories" in 35 U.S.C. § 100(c).[2] WesternGeco rests its argument on a single Supreme Court case that interprets the term "possession" in the Fair Labor Standards Act of 1938 ("FLSA") to refer to areas beyond U.S. territories so long as Congress can exercise control in them. *See Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 386-90 (1948). Since the United States can control economic activity in the EEZ, WesternGeco contends that the EEZ is a possession of the United States.

*Vermilya-Brown* involved a FLSA claim for overtime pay brought by employees of American contractors engaged in the construction of a U.S. military base in an area of Bermuda leased by Great Britain to the United States. *Id.* at 378-79. At that time, FLSA covered "any State of the United States or the District of Columbia or any Territory or possession of the United States." *Id.* at 379 (quoting FLSA §§ 3(b), 3(c)). The Court acknowledged that the leased areas were under the sovereignty of Great Britain and the leases did not transfer sovereignty to

---

[2] Our analysis in the March 2011 Order did not focus on the issue of whether the EEZ, or even the high seas or the OCS, could be considered a U.S. possession. Although WesternGeco could have raised the distinction between "territories" and "possessions" in its briefing prior to the March 2011 Order, it focused upon the general argument that the EEZ should be considered part of the United States since that was the tenor of the Fugro Defendants' arguments.

and were not territory of the United States. *Id.* at 380-81. However, the Court recognized the general principle that Congress possessed the power to regulate actions of U.S. citizens outside of the territorial jurisdiction of the United States regardless of whether the acts occurred within the territory of a foreign nation. *Id.* at 381. As an outgrowth of that principle, "civil controls may apply, we think, to liabilities created by statutory regulation of labor contracts, even if aliens may be involved, where the incidents regulated occur on areas under the control, though not within the territorial jurisdiction or sovereignty, of the nation enacting the legislation."[3] *Id.* at 381. The Court examined the control exercised by the United States over its Bermuda leaseholds and determined that the governing lease documents between the United States and Great Britain vested the United States with the legislative power to establish labor laws akin to FLSA. *Id.* at 382-83.

The Court then engaged in a process of statutory construction to determine whether the term "possession" in FLSA included the Bermuda leaseholds. *Id.* at 383-90. "The word 'possession' is not a word of art, descriptive of a recognized geographical or governmental entity," *id.* at 386, but rather must be construed as "the lawmakers, within constitutional limits, would have done had they acted at the time of the legislation with the present situation in mind." *Id.* at 388. Legislative intent must be determined not only through the words themselves, but also the context, the purposes of the law, and the circumstances under which the words were employed. *Id.* at 386. The Court noted that the legislative history of FLSA did not refer to any of the leaseholds of the United States, such as the Panama Canal Zone, Guantanamo Bay, Cuba, the

---

[3] The Fugro Defendants attempt to distinguish *Vermilya-Brown* on the ground that it involved Congressional power to regulate the actions of U.S. citizens outside the United States, while here the actors involved may or may not be U.S. citizens. However, *Vermilya-Brown* grounded its analysis upon the character of the physical situs of employment rather than upon the citizenship of the employer or employees. *See Vermilya-Brown*, 355 U.S. at 381 (Congress can regulate labor contracts involving noncitizens if the incidents regulated occur in areas under the control of the United States).

Philippines, or certain Nicaraguan islands. Indeed, the Court could not ascertain whether Congress intended for the term "possession" in FLSA to encompass leased areas. *Id.* at 388. Rather, the Court found that the issue of whether "statutes are effective beyond the limits of national sovereignty" is dependent upon the "purpose of the statute." The Court held that, because FLSA was remedial in nature and the Bermuda leasehold was an area where the United States has "sole power,"[4] Congress intended, in using the word "possession," to have FLSA apply to employer-employee relationships on foreign territory under lease for bases. *Id.* at 390; *see also Steele v. Bulova Watch Co.*, 344 U.S. 280, 291 (1952) (Reed, J., dissenting) (*Vermilya-Brown* held that "possessions" of the United States was a broader geographic category than "areas under the territorial jurisdiction or sovereignty of the United States"); *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949) (*Vermilya-Brown* recognized that "possessions" within the meaning of FLSA covered areas beyond those over which the United States had sovereignty).

We agree with the Fugro Defendants that *Vermilya-Brown* is not controlling because it addresses whether the term "possession" in the context of FLSA can reference *land* leased by the United States rather than whether the term "possessions" in the Patent Act can encompass *ocean* areas that are the United States' EEZ. However, *Vermilya-Brown*'s analysis is instructive because the question presented here, like in *Vermilya-Brown*, is one of congressional intent rather than congressional power. As we recognized in our March 2011 Order, Congress has the power to enforce its laws beyond the territorial boundaries of the United States, including areas that are under the control of the United States though not considered territory of the United States. *See Litecubes, LLC v. N. Light Prods.*, 523 F.3d 1353, 1363 (Fed. Cir. 2008) (citing

---

[4] The Court's reference to the United States' "sole power" over the Bermuda leasehold was not equivalent to stating that the United States possessed sovereignty over the leasehold. *Vermilya-Brown*, 335 U.S. at 390. Rather, the Court emphasized that the House of Assembly of Bermuda would not undertake legislation similar to FLSA to control labor relations on the base, leaving the United States as the only nation that would be likely to do so. *Id.* at 389.

*E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248, 111 S. Ct. 1227, 113 L. Ed. 2d 274 (1991));

*Vermilya-Brown*, 335 U.S. at 381 (citing Constitution Art. IV § 3 cl. 2).  Whether use of the

word "possessions" indicates a Congressional intent to bring the EEZ within the scope of the

Patent Act is one of statutory construction.

　　Here, we must construe the term "possessions" as it appears in the Patent Act. In cases of

statutory construction we begin with the language of the statute. *Southeastern Community*

*College v. Davis*, 442 U.S. 397, 405 (1979). "[U]nless otherwise defined, words will be

interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*,

444 U.S. 37, 42 (1979); *see also Williams v. Taylor*, 529 U.S. 420, 431 (2000). Dictionaries of

the English language provide the ordinary meaning of words used in statutes. *See, e.g.*, *Carey v.*

*Saffold*, 536 U.S. 214, 219-20 (2002). Section 100(c) of Title 35 states that the "terms 'United

States' and 'this country' mean the United States of America, its territories and possessions." 35

U.S.C. § 100(c) (2011). Webster's Third New International Dictionary defines "possession" as

"something owned, occupied, or controlled." *Webster's Third New International Dictionary*

1770 (1971).

　　Applying the ordinary meaning of the word "possession" here, it is clear that the United

States neither "owns" nor "occupies" the EEZ since it has recognized that the EEZ is not the

territory of the United States and that other nations possess the traditional freedoms of the high

seas in the EEZ. However, the United States does possess a certain degree of "control" over the

EEZ. The United States' control exists in the form of a bundle of sovereign rights and

jurisdiction related to the economic exploitation, scientific exploration, and natural resource

development of natural resources within the EEZ and the OCS. The Presidential Proclamation

establishing the EEZ stated that:

> Within the Exclusive Economic Zone, the United States has, to the extent permitted by international law, (a) sovereign rights for the purpose of exploring, exploiting, conserving and managing natural resources, both living and non-living, of the seabed and subsoil and the superjacent waters and with regard to other activities for the economic exploitation and exploration of the zone, such as the production of energy from the water, currents and winds; and (b) jurisdiction with regard to the establishment and use of artificial islands, and installations and structures having economic purposes, and the protection and preservation of the marine environment.

Presidential Proclamation No. 5030. Congress has enacted extensive legislation to implement the sovereign rights recognized by this Presidential statement. *See* 1 *Thomas J. Schoenbaum*, *Admiralty and Mar. Law* § 2-16, at 39 (4th ed. 2004) (citing legislation).

Although the level of control that the United States possesses in the EEZ is analogous to the level of control that the United States possessed in the Bermuda leasehold that was the subject of *Vermilya-Brown*, there is at least one significant difference between the two.[5] In *Vermilya-Brown*, the Great Britain granted the United States the "rights, power and authority within the Leased Areas which are necessary for their control," which included control over labor relations on the military base. *Vermilya-Brown*, 335 U.S. at 382 n.4. Extension of FLSA to employees within the leasehold fell within the "control" over labor relations exerted by the United States over the leasehold. Here, extension of the Patent Act to the EEZ would go far beyond the limited control the United States possesses over the EEZ. The rights exercised by the United States in its EEZ and continental shelf are "functional in character, limited to specified

---

[5] Another significant difference between the control exercised by the United States over the EEZ and the control exercised in the Bermuda leasehold is the character of the rights the United States possessed over each. The United States possesses "sovereign rights" over the EEZ, though the number and nature of those sovereign rights is limited to particular subject matter and does not abrogate the traditional freedoms of the high seas. In contrast, the United States possessed no sovereign rights in the Bermuda leasehold, but was granted by Great Britain "all rights, power and authority within the Leased Areas which are necessary for the establishment, use, operation and defence thereof, or appropriate for their control." *Vermilya-Brown*, 335 U.S. at 380, 382 n.4. WesternGeco characterizes the U.S. control over the EEZ as commensurate, if not broader than, the leasehold rights owned by the United States in *Vermilya-Brown*. Certainly the "sovereign" nature of the United States' subset of rights over the EEZ is stronger than the leasehold rights, which, although broader in substantive scope, were non-sovereign in nature. However, we must focus not only upon the character of rights possessed by the United States over the EEZ, but the substantive scope of those rights. Here, the substantive scope of rights possessed by the United States is quite limited as compared to the rights possessed by the United States in the Bermuda leasehold.

activities." Restatement (3d) of Foreign Relations Law § 511 cmt. b.The United States' control over the EEZ is limited to the power to economically exploit, explore and manage natural resources or energy, to conserve natural resources from the superjacent waters, seabed, or subsoil, and to exercise jurisdiction over physical installations having economic purposes and environmental preservation measures. Presidential Proclamation No. 5030 recognizes that the EEZ remains outside the territory of the United States and foreign nations retain the high seas freedoms of navigation, overflight, the laying of submarine cables and pipelines, and other internationally lawful uses of the sea.

With respect to the particular infringing activities alleged here, which involve the Fugro Defendants' commercial exploration of natural resources in the EEZ, extension of the Patent Act to the EEZ would certainly coincide with the type of control exercised by the United States over the EEZ, namely the right to explore and exploit natural resources in the seabed. However, bringing the EEZ within the scope of the Patent Act might also implicate conduct in the EEZ over which the United States has no control, such as activities on a ship that have no relation to natural resource exploration or exploitation.

Moreover, the Presidential Proclamation establishing the EEZ notes that the EEZ is a "zone contiguous to the territorial sea, including zones contiguous to the territorial sea of . . . the United States overseas territories and possessions." Presidential Proclamation No. 5030. This language suggests two things: (1) the EEZ is not considered a "possession," but rather is considered a "zone" contiguous to the territorial sea of a possession; and (2) that the term "possession" refers to land, rather than sea, because possessions are characterized as having a separate "territorial sea."

The legislative history of the Patent Act of 1952, in which § 100(c) was first enacted, offers little guidance. The report prepared by the Judiciary Committee of the House of Representatives regarding the Patent Act of 1952 states that the purpose of the bill is to make substantive legal changes in the patent law in addition to "simplification and clarification of language and arrangement, and elimination of obsolete and redundant provisions." H.R. Rep. No. 1923, 82d Cong., 2d Sess., 5 (1952). (Doc. 149 Ex. C at 9.) The Committee Report refers to 35 U.S.C. § 100 as a "new section" added to Title 35 "to avoid the use of long expressions in various parts of the revised title." *Id.* The part of the revised title relevant to us is the section proscribing direct infringement of patents. In the prior version of the statute, § 72 related to "Infringement of Patent" and stated that "[a]ny person who makes, uses or sells any patented machine, manufacture, composition of matter or improvement, or uses any patented process or improvement, ***within the territory of the United States and its Territories*** . . . infringes the patent . . . ." 35 U.S.C. § 72 (1951) (emphasis added). The Patent Act of 1952 amended § 72 and codified it as § 271(a) of Title 35. *See* H.R. Rep. No. 1923 at 28. As amended, section 271(a) stated: "whoever without authority makes, uses or sells any patented invention, ***within the United States*** during the term of the patent therefore, infringes the patent." 35 U.S.C. § 271(a) (1952) (emphasis added). (Doc. No. 149 Ex. E at 4.) The language regarding "within the territory of the United States and its Territories" in § 72 was simplified to read "within the United States" in § 271(a), in accordance with the purpose of Patent Act of 1952 to simplify and clarify the language of the statute.

What is left unexplained in the legislative history is why, when deleting the language "United States and its Territories" in § 72 and adding a definition of the "United States" in § 100(c), Congress added the words "and possessions" to the definition of "United States." All we

15

can gather from the legislative history is that the term "possessions" was an affirmative addition to the statutory language. As such, it must be given a definition separate and distinct from that of "territory."[6] *See TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal citations and quotation marks omitted) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."); *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1345 (Fed. Cir. 2010) (stating rule of statutory construction that Congress does not use unnecessary words).

WesternGeco argues that, since *Vermilya-Brown*'s holding regarding the scope of "possession" in the FLSA to cover the Bermuda leasehold was decided in 1948, it is reasonable to presume that Congress was aware of this holding a few short years later and intentionally added "possessions" to extend the Patent Act beyond the territorial limits of the United States to areas under its control. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 696-99 (1979) (in *dicta*, recognizing presumption that Congress is aware of judicial interpretations of comparable language in other statutes when using the same language in new statutes). While this may be true, all Congress could have adopted from *Vermilya-Brown* is an understanding that U.S. patent law would apply to areas analogous to the Bermuda leasehold, which was a land area. In contrast, the EEZ was first recognized in international conventions through the Third United Nations Convention on the Law of the Sea arts. 55-57, Dec. 10, 1982, 1833 U.N.T.S. 397 (1982). Domestically, Presidential Proclamation No. 5030 recognizing the EEZ was issued only in

---

[6] We disagree with the Fugro Defendants' contention that *Vermilya-Brown* endorsed a definition of "possession" that was equivalent to "territory." *See Vermilya-Brown*, 335 U.S. at 382 n.4 (recognizing the leasehold as distinct from the "territory"). The Fugro Defendants' citation of the Department of Interior's definitions of "possession" and "territory" as equivalent cannot trump the canon of statutory construction requiring us to give effect to each word in the Patent Act.

1983.[7] As such, we think it unlikely that Congress could have discerned from *Vermilya-Brown* an understanding of "possession" that encompassed areas of the sea under U.S. control.[8] As the Supreme Court has stated, "[i]n a case like this, in which Congress has not plainly marked our course, we must be circumspect in construing the scope of rights created by a legislative enactment which never contemplated such a calculus of interests." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 431 (1984), *superseded by statute*, 17 U.S.C. §§ 1201(a), (b); *see also Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 451-58 (2007) (refusing to close "loophole" in legislation that allowed infringement to occur abroad).

As for the purpose of the Patent Act, like prior patent laws enacted by Congress, the Patent Act of 1952 was intended to carry out the Constitutional provision vesting Congress with the power to "secur[e] for limited times to authors and inventors the exclusive right to their respective writings and discoveries." Constitution, Art. I, § 8. The Patent Act allows, through the creation of a patent, for a "monopoly which, although sanctioned by law, has the economic consequences attending other monopolies."[9] *Blonder-Tongue Lab. v. Univ. of Ill. Found.*, 402 U.S. 313, 343 (1971). As the Supreme Court has stated:

---

[7] In 1958, the Convention on the Continental Shelf was signed. *See* Convention on the Continental Shelf, Apr. 29, 1958, 15 U.S.T. 471, 499 U.N.T.S. 311 (entered into force June 10, 1964). Though this Convention recognized the right of Coastal states over the continental shelf outside of the area of the territorial sea, it simultaneously recognized that these rights did not affect "the legal status of the superjacent waters as high seas, or that of the airspace above those waters." *Id.* arts. 1, 3. This convention does not contain any reference to the EEZ.

[8] Indeed, in *Vermilya-Brown*, the Court thought it instructive that the FMLA had been applied to areas analogous to the Bermuda leasehold, including Puerto Rico, Guam, the Guano Islands, Samoa, and the Virgin Islands. *See Vermilya-Brown*, 335 U.S. at 388. Here, we have found no legislative or judicial authority extending U.S. patent law to cover an area analogous to the EEZ—i.e., an area that is outside our sovereign authority and not part of U.S. territory, but over which the U.S. possesses some level of control.

[9] WesternGeco states that the Court "relied on" *Decca Ltd. v. U.S.*, 544 F.2d 1070, 1074 (Ct. Cl. 1976), and *Ocean Science & Engineering, Inc. v. U.S.*, 595 F.2d 572 (Ct. Cl. 1979), when holding in the March 2011 Order that the United States' EEZ was not subject to United States patent law. (Doc. No. 149 at 14.) We did no such thing. We referenced *Decca* and *Ocean Science* in a section where we outlined the few cases that have addressed whether a particular geographic area is United States territory. We did not rely on *Decca* or *Ocean Science* in arriving at our determination about whether the United States' EEZ is U.S. territory, but rather only noted that *Decca* and *Ocean Science* were an indication that the analysis in the prior cases of *Gardiner v. Howe*, 9 F. Cas. 1157 (C.C.D. Mass. 1865), and *Marconi Wireless Tel. Co. v. United States*, 99 Ct. Cl. 1 (Ct. Cl. 1942), had fared poorly in subsequent years. Indeed, we fully recognized that *Decca* did not rest its holding upon whether a receiver on a ship outside of

> A patent by its very nature is affected with a public interest. . . . [It] is an exception to the general rule against monopolies and to the right to access to a free and open market. The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope.

*Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 816 (1945). The caution against expanding the scope of the monopoly created by a patent was not present in *Vermilya Brown*, which relied upon the remedial nature of FLSA as a basis to conclude that Congress would have intended the term "possession" in FLSA to have a broad reach. *See Vermilya-Brown*, 335 U.S. at 390.

WesternGeco responds that, when the United States possesses sole authority to regulate patents in an area, a broad construction of U.S. patent law should apply. There are two problems with this argument. First, WesternGeco contends that no other nation can promulgate protections over "economic activity" in this region. This statement fails to acknowledge that the "sole" authority to regulate "economic activity" is not identical to the "sole" authority to promulgate patent laws in a geographic area. Further, the United States does not have sole authority to regulate all economic activity within the EEZ, but only circumscribed authority over economic activity relating to natural resource exploration and exploitation. As for authority to promulgate patent law within the EEZ, it is not clear that the United States would be the only nation with the ability to do so. The Fugro Defendants contend that Norway would also have the authority to enforce its patent laws upon Norwegian-flagged vessels traversing the United States' EEZ. In addition, we note that, while the United States' EEZ in the Chukchi Sea does not appear to be subject to other nations' competing claims to an EEZ in that same area, this may not hold true for

---

the United States was "located" within the United States. As for *Ocean Science*, we simply noted that the opinion had recognized that, under the doctrine of strict construction, the scope of the patent law should be strictly limited to the provisions of the statute. We did not apply or discuss *Ocean Science* or *Decca* in the section of our March 2011 Order that actually discussed whether the EEZ should be considered U.S. territory.

other parts of the United States' EEZ, which could be subject to competing claims by neighboring nations.

Second, WesternGeco cites a treatise to support the proposition that, where Congress possesses sole authority to regulate, a broad construction should apply to deciding what constitutes a territory or possession of the United States. *See* Robert A. Matthews, Jr., Annotated Patent Digest § 10:22 (2011). However, the treatise discusses this principle in the context of field preemption. The "where" that is being discussed in the treatise is the substantive area of law, not a geographic area. Moreover, the treatise explicitly states that the Patent Act provides that the "land territories and *land* possessions of the United States fall within the scope" of the Patent Act. *Id.* Ultimately, we find that, although the United States has sole authority to legislate in the substantive area of patent law, this is not equivalent to the sole authority to legislate in a geographic area.

In sum, we have carefully reviewed the statutory construction to be provided to the term "possessions" in 35 U.S.C. § 100(c). Though the ordinary meaning of "possessions" would include areas within United States' control, we believe that the United States' circumscribed level of control over the EEZ is insufficient to characterize it as a "possession" of the United States. In addition, we do not believe that the Congressional intent evinced in the legislative history of the Patent Act of 1952 indicates that Congress believed the term "possessions" to include areas of sea rather than areas of land. We also find persuasive the distinction between the purpose and effect of patent law to create monopolies, on one hand, and the purpose of FLSA to offer a remedy to employees. Finally, we are unconvinced that the United States possesses the sole power to regulate patents in the area of the EEZ. We hold that the EEZ is not a "possession"

19

of the United States within the meaning of U.S. patent law. We deny WesternGeco's motion for partial reconsideration.

### B.   WesternGeco's Motion to Strike

WesternGeco has moved to strike the Fugro Defendants' motion to dismiss. WesternGeco contends that the arguments contained in the Fugro Defendants' motion to dismiss are actually requests for reconsideration of the March 2011 Order and should have been filed as a motion for reconsideration under Rule 59(e).WesternGeco argues that the Fugro Defendant have avoided their responsibility under the Federal Rules of Civil Procedure to answer WesternGeco's amended complaint by improperly filing a motion for reconsideration as a motion to dismiss. Therefore, WesternGeco requests that the Fugro Defendants' motion to dismiss be stricken and the Fugro Defendants be ordered to answer its amended complaint.

In response, the Fugro Defendants contend that WesternGeco's motion to strike is procedurally unauthorized. Under Rule 12(f), a party may move to strike "from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The Fugro Defendants note that WesternGeco has not identified any "redundant, immaterial, impertinent, or scandalous" matter in their motion to dismiss. Further, Rule 12(f) only authorizes motions to strike pleadings and does not authorize motions to strike other motions. *See Lineberry v. United States*, 2009 WL 763052, at *3 (N.D. Tex. Mar. 23, 2009). Defendants highlight the disfavor with which courts view Rule 12(f) motions, granting them "only when the pleading to be stricken has no possible relation to the controversy." *Florance v. Buchmeyer*, 500 F. Supp. 2d 618, 645 (N.D. Tex. 2007) (citations omitted), *appeal dismissed*, 258 Fed. Appx. 702 (5th Cir. 2007). Finally, Defendants claim that they are justified in incorporating the arguments from their first motion to dismiss into their second motion to dismiss because of the holding in *Dean v. Ford*

*Motor Credit Co.*, 885 F.2d 300, 302 (5th Cir. 1989) (defendant waived an argument on appeal because its motion to dismiss filed in response to an original complaint did not automatically relate forward to address an amended complaint filed after the motion to dismiss had been denied).

In reply, WesternGeco clarifies that its motion to strike is not based upon Rule 12(f), but instead is based upon the court's "inherent power to manage its own docket to achieve the just and efficient disposition of cases." *In re Stone*, 986 F.2d 898, 903 (5th Cir. 1993). According to WesternGeco, this inherent power includes the ability to strike improper motions. *See, e.g.*, *Ready Transp., Inc. v. AAR Mfg., Inc.*, 627 F.3d 402, 404 (9th Cir. 2010); *Settlement Capital Corp. Inc. v. Pagan*, 2009 WL 111563, at *3-*4 (N.D. Tex. Jan. 16, 2009); *Centillium Commc'ns, Inc. v. Atl. Mut. Ins. Co.*, 2008 WL 728639, at *6 (N.D. Cal. Mar. 17, 2008); *Zep, Inc. v. Midwest Motor Supply Co.*, 726 F. Supp. 2d 818, 822-23 (S.D. Ohio 2010).

We agree with WesternGeco that the Court has the inherent power to strike the Fugro Defendants' pending motion to dismiss. We further recognize that the Fugro Defendants have included within their motion to dismiss arguments for us to reconsider our March 2011 Order in addition to their arguments regarding the sufficiency of WesternGeco's amended complaint. With respect to the Fugro Defendants' 12(b)(6) arguments, we note that some of these are properly raised given the expanded and additional allegations that WesternGeco has chosen to include in its amended complaint. With respect to the Fugro Defendants' arguments regarding reconsideration of our March 2011 Order, we will apply the Rule 59(e) standard to determine whether these arguments should succeed. In light of the complex legal issues presented in this case, some of first impression, we believe that a just disposition of this case must confront the

colorable legal arguments raised by all parties. Therefore, we deny WesternGeco's motion to strike the Fugro Defendants' motion to dismiss.

### C.     The Fugro Defendants' Motion to Dismiss

The Fugro Defendants have moved to dismiss new allegations contained in WesternGeco's amended complaint and have also moved to reconsider certain holdings in the March 2011 Order. We will apply the legal standard under Rule 12(b)(6) to assess the sufficiency of WesternGeco's new allegations in its amended complaint and the legal standard under Rule 59(e) to assess the Fugro Defendants' requests for reconsideration of the March 2011 Order's holdings.

### 1.     Allegations Regarding the Gulf of Mexico Survey

The Fugro Defendants contend that WesternGeco's new allegations regarding potential direct infringement under 35 U.S.C. § 271(a) arising out of the Gulf of Mexico survey cannot state a claim upon which relief can be granted. It is undisputed that the Gulf of Mexico survey will take place outside the United States. Therefore, the Fugro Defendants rely upon the Court's March 2011 Order to argue that activity that takes places outside the United States cannot constitute direct infringement of a United States patent.

Based on our holding in the March 2011 Order and our denial in this order of WesternGeco's motion to reconsider, we must agree. We dismiss WesternGeco's claims of direct infringement under § 271(a) to the extent that they are based on the Fugro Defendants' activities while in or upon the EEZ of the United States in the Gulf of Mexico.

### 2.     Reconsideration regarding 35 U.S.C. § 272

Section 272 of Title 35 excuses infringement of inventions used in vehicles entering the United States temporarily or accidentally as long as the "invention is used exclusively for the

needs of the vessel, aircraft or vehicle and is not offered for sale or sold in or used for the manufacture of anything to be sold in or exported from the United States." In our March 2011 Order, we rejected the Fugro Defendants' reliance on § 272 to excuse the infringement allegedly arising out of its use of Ion devices in the Chukchi Sea survey. We held that § 272 was not applicable because, according to the allegations in the complaint, the Fugro Defendants would be using the Ion devices to manufacture 3D data for sale to Statoil, a company located in the United States. Therefore, the Fugro Defendants would be using the allegedly infringing device to manufacture an item to be sold in the United States and could not take advantage of § 272 to avoid liability.

The Fugro Defendants have moved for reconsideration of this holding. They argue that the term "manufacture" has been interpreted by the Supreme Court and the Federal Circuit to require a physical product and to exclude information and signals containing information, such as seismic 3D data. In response, WesternGeco argues that the Fugro Defendants are not selling "raw information" or "an electromagnetic signal" to its customers in the United States, but rather are manufacturing and selling a "final edited navigation tape or other suitable storage medium of all data," as described in the permit application for the Gulf of Mexico survey submitted to the Department of the Interior. (Am. Compl. Ex. G.) In response to a question regarding the "time and manner in which data and information resulting" from the Gulf of Mexico survey would be available, the Fugro Defendants stated on the permit application that "[t]apes will be available in SEGY format in December 31, 2012." (*Id.* at 6.) With respect to the Chukchi Sea survey, the Fugro Defendants stated "NA" in response to this same question on their permit application. (Am. Compl. Ex. F at 56.) However, the terms of the Chukchi Sea permit application required

the Fugro Defendants to create a "final edited navigation file on suitable storage medium of all data or sample locations." (*Id.* at 61.)

We are required to apply the standards of Rule 59(e) to this request for reconsideration. As there has been no change in the controlling law or newly discovered evidence, we will reconsider our prior holding on this issue only in order to correct a manifest error of law or fact. The Fugro Defendants cite *Diamond v. Chakraborty*, 447 U.S. 303 (1980), for the definition of "manufacture" in 35 U.S.C. § 101 as "the production of articles for use from raw or prepared materials by giving to these materials new forms, qualities, properties, or combinations, whether by hand-labor or by machinery." *Id.* at 308 (quoting *American Fruit Growers, Inc. v. Brogdex Co.*, 283 U.S. 1, 11 (1931)). In *In re Nuijten*, 500 F.3d 1346, 1356-57 (Fed. Cir. 2007), the Federal Circuit applied this definition of "manufacture" to hold that the production of a transient electric or electromagnetic transmission does not fit within the definition of "manufacture" because it is not a tangible article or commodity. Interpreting § 271(g), the Federal Circuit similarly held that "manufacture" refers only to the production of tangible goods and not to intangibles such as information. *Bayer AG v. Housey Pharms., Inc.*, 340 F.3d 1367, 1371-72 (Fed. Cir. 2003); *see also NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1323 (Fed. Cir. 2005) ("Because the 'transmission of information,' like the 'production of information,' does not entail the manufacturing of a physical product, section 271(g) does not apply to the asserted method claims in this case any more than it did in *Bayer*.").

If the seismic data generated in the Chukchi Sea survey and the Gulf of Mexico survey remained as intangible electronic information, we might be persuaded by the Fugro Defendants' arguments. However, at the motion to dismiss stage of proceedings, we limit ourselves to review of the allegations contained in plaintiff's complaint and its attachments. *Collins v. Morgan*

*Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (citing Fed. R. Civ. P. 12(b)(6)). These documents allege that the seismic data collected by the Fugro Defendants will be recorded onto a tangible medium. These allegations are sufficient to state a claim that the Fugro Defendants will be using the invention to be manufacture a tangible product and that the seismic data recorded onto the tangible medium will be sold within the United States. As the Supreme Court stated in *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 450-51 (2007), the imprinting of abstract software onto a computer-readable medium transforms abstract information into a tangible item.[10] *See also CNET Networks, Inc. v. Etilize, Inc.*, 528 F. Supp. 2d 985, 994 (N.D. Cal. 2007) (electronic catalog containing data files became tangible item when it expressed and stored on computer readable media). We find that, due to the allegations in the complaint, § 272 does not prevent liability from being imposed on the Fugro Defendants. The Fugro Defendants have not succeeded in demonstrating a manifest error in law or fact that requires us to reconsider our holding on this issue.

### 3.    Reconsideration regarding "Sale" and "Offers for Sale"

In our March 2011 Order, we recognized that the "Fugro Defendants have not challenged WesternGeco's allegations of their direct infringement in the form of 'sale' or 'offers to sell' in the United States." (March 2011 Order at 43.) Section 271(a) of Title 35 states:

> (a) Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

---

[10] The Fugro Defendants argues that the Supreme Court in *AT&T* focused upon whether software could be considered a "component" under § 272 and did not address the meaning of "manufacture" under the patent statute. However, we look to *AT&T* for guidance on what the Supreme Court views as a tangible item sufficient for purposes of patent law, which we think is the dispositive inquiry.

35 U.S.C. § 271(a). The Fugro Defendants now raise such an argument even though motions for reconsideration should not be used to raise arguments that could have been made before the entry of an order. *See Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473-74 (5th Cir. 1989).

As an initial matter, it is clear that simply the performance of steps comprising WesternGeco's asserted method claims cannot be used to support a claim for direct infringement under the "sell" or "offers to sell" prong of 271(a). *See NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1320-21 (Fed. Cir. 2005). Though the Federal Circuit in *NTP, Inc.* left open the question of whether method claims could be infringed under the "sell" and "offers to sell" prongs of § 271(a) through other types of acts, it recognized that the legislative history of § 271(a) indicated Congress's understanding that method claims could be directly infringed only under the "use" prong of § 271(a). *Id.* at 1320; *see also Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1334-35 (Fed. Cir. 2008). Moreover, the *NTP* court recognized the difficulty of applying the concept of a "sale" to a method claim consisting of a series of acts. *NTP, Inc.*, 418 F.3d at 1319. Here, it is similarly difficult to understand how the Fugro Defendants sold or offered for sale WesternGeco's method claims, because the concept of "sale" includes the "concept of a transfer of title or property." *Id.*

However, WesternGeco has asserted both method *and* apparatus claims in its patents. With respect to the apparatus claims of WesternGeco's patents, WesternGeco alleges that the Fugro Defendants have engaged in sales or offers to sell in and from the United States "products and services relating to steerable streamers (including but not limited to products and services incorporating DigiFIN and ORCA)." (Am. Compl. ¶¶ 35, 41, 47, 53, 59.) Moreover, it argues that its allegations support the inference that the Fugro Defendants have sold "infringing systems and services" that are provided from the United States' ports and territorial waters. (Doc. No.

153 at 12.) We agree. We note that, at the motion to dismiss stage, we are required to determine only whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. Although the Fugro Defendants challenge the truth of the allegations made by WesternGeco, we must not engage in an evaluation of the merits of the allegations, but merely satisfy ourselves that WesternGeco has pled a legally cognizable claim. Here, we find that WesternGeco's allegations that the Fugro Defendants, some of which are located in the United States, offered for sale a system that infringed upon its patents to state a plausible claim for "sales" or "offers to sell" under § 271(a). The Fugro Defendants, failing to raise this argument in their prior motion to dismiss though they certainly could have done so, have not demonstrated a clear error in law or fact, a change in controlling law, or previously unavailable evidence to persuade us to reconsider this issue.

### 4.      Reconsideration regarding Contributory Infringement and Inducement

In our March 2011 Order, we refused to dismiss WesternGeco's claims under 35 U.S.C. § 271(b), (c) for inducing and contributory infringement against the Fugro Defendants. Since the parties had not argued the issue of whether extraterritorial activity could give rise to liability under § 271(b), (c), we declined to rule on that issue. We further noted that, though inducing and contributory infringement require the presence of direct infringement, the acts of direct infringement may be performed by a party other than the Fugro Defendants.

The Fugro Defendants have now moved for reconsideration of this holding. They argue that the only acts of direct infringement by the Fugro Defendants alleged are acts that occur outside the territory of the United States or are exempted by § 272. Therefore, without the presence of direct infringement, the Fugro Defendants believe that they cannot be held liable for inducing or contributory infringement.

The Fugro Defendants have not demonstrated any change in controlling law, any previously unavailable evidence, or any manifest error of law or fact to warrant reconsideration of this holding. With respect to the presence of direct infringement committed by the Fugro Defendants, we have already held that the § 272 exception to liability does not apply to the Fugro Defendants. In addition, we have noted the narrow holding regarding § 271(a) infringement— that § 271(a) claims cannot be based upon acts by the Fugro Defendants while located in or upon Statoil's lease holdings in the Chukchi Sea or in or upon the EEZ in the Gulf of Mexico, but that § 271(a) claims can be based on other acts by the Fugro Defendants within the United States.

Alternatively, the direct infringement can be committed by a party other than the Fugro Defendants. *See Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004) ("Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement though the direct infringer is typically someone other than the defendant accused of indirect infringement."). We are not persuaded otherwise by *McKesson Tech. Inc. v. Epic Systems Corp.*, Case No. 2010-1291, 2011 U.S. App. LEXIS 7531 (Fed. Cir. Apr. 12, 2011), *petition for reh'g en banc granted and panel opinion vacated by* 2011 U.S. App. LEXIS 10674 (Fed. Cir. May 26, 2011). In the now-vacated panel opinion in *McKesson*, the court recognized that induced infringement requires the presence of a direct infringer and that a method claim is only directly infringed if each step of the claimed method is performed by a single party. Here, WesternGeco's complaint against Ion contains sufficient allegations of direct infringement by Ion. Therefore, we decline to reconsider our holding on this issue.

### 5.      Reconsideration of "Supply" and § 271(f)

In its original and amended complaint, WesternGeco asserted a claim under 35 U.S.C. §

271(f) against the Fugro Defendants. This statute states:

> (1) Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.
> (2) Whoever without authority supplies or causes to be supplied in or from the United States any component of a patented invention that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use, where such component is uncombined in whole or in part, knowing that such component is so made or adapted and intending that such component will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

35 U.S.C. § 271(f). In our March 2011 Order, we held that the allegations contained in

WesternGeco's original complaint and the Chukchi Sea survey permit application attached to the

complaint contained sufficient facts to state a claim under § 271(f). Specifically, we focused on

the Fugro Defendants' statement in the permit application that the vessels conducting the seismic

survey would be supplied from Dutch Harbor, Alaska. We drew all reasonable inferences in

favor of WesternGeco and found that it was plausible that components of an apparatus that

infringed upon WesternGeco's patents would be supplied from Dutch Harbor because the entire

purpose of the mobilization of the Fugro Defendants' vessels from Dutch Harbor was to conduct

a seismic survey. We also stated that WesternGeco had made sufficient allegations regarding the

Fugro Defendants' intent by stating that the Fugro Defendants were aware of WesternGeco's

patents.

The Fugro Defendants have now moved for reconsideration of our holding. In essence,

they claim that WesternGeco has failed to state sufficient facts in its amended complaint to state

a claim for infringement under § 271(f). Specifically, they contend that there is no showing that

"all or a substantial portion of components" or a component "especially made or especially adapted for use in the invention" will be supplied from Dutch Harbor. In addition, they argue that WesternGeco has failed to plead the intent required by § 271(f).

The Fugro Defendants have not demonstrated any change in controlling law, previously unavailable evidence, or manifest error of law or fact to persuade us to reconsider our previous ruling on this issue. The presentation made by the Fugro Defendants during the oral argument emphasized that the Fugro Norway Defendants' vessels already possessed the Ion devices and did not need to be supplied with infringing components from Dutch Harbor. First, we note that this information was available to the Fugro Defendants prior to our March 2011 Order. In addition, the vessel specifications do not clearly and definitively contradict WesternGeco's allegations that components of an infringing device were supplied from Dutch Harbor. We find WesternGeco's allegations in its original and amended complaint sufficient to state a claim under § 271(f). In addition, we find that WesternGeco's allegations sufficiently state that the Fugro Defendants possessed a specific intent to infringe under § 271(f). *See Grice Eng'g, Inc. v. JG Innovations, Inc*., 691 F. Supp. 2d 915, 927 (W.D. Wis. 2010).

In addition, we do not agree with the Fugro Defendants that the case of *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc*., 576 F.3d 1348 (Fed. Cir. 2009), forecloses WesternGeco's claims under § 271(f) as a matter of law. In *Cardiac Pacemakers*, the Federal Circuit held that § 271(f) does not cover method claims. *Id.* at 1359. The Federal Circuit focused heavily in *Cardiac Pacemaker* on the fact that method claims do not have "components" in the form of physical components used in the performance of the method. In addition, the Federal Circuit noted that method claims cannot be "supplied" within the meaning of § 271(f). Here, however, the asserted claims of WesternGeco's patents include apparatus and method claims.

30

The apparatus claims can be composed of physical components and supplied overseas. Supply of the physical components of an apparatus claim could support liability under § 271(f). Therefore, we decline to reconsider our prior holding that WesternGeco stated a claim against the Fugro Defendants for infringement under § 271(f).

### 6.      Incorporation and Reassertion of Prior Motions to Dismiss

Finally, the Fugro Defendants incorporate and reassert all of the arguments contained in their prior motions to dismiss. We recognize that the Fugro Defendants may need to reassert these arguments in order to preserve them for appeal. However, these are essentially arguments to reconsider our prior holdings on these issues in our March 2011 Order. The Fugro Defendants have pointed out no manifest error of law or fact, change in controlling law, or previously unavailable evidence that would persuade us to reconsider our prior holdings on these issues. Therefore, we deny their requests to reconsider their previously-asserted arguments and our prior holdings regarding these arguments.

### D.      WesternGeco's Motion to Compel

WesternGeco has moved to compel the Fugro Defendants to provide Rule 26(a) initial disclosures, to respond to WesternGeco's discovery requests, and to answer WesternGeco's amended complaint. WesternGeco contends that the pending motion to dismiss filed by the Fugro Defendants has not stayed discovery obligations or vacated the Scheduling/Docket Control Order entered in this case. We decline to take up the merits of this motion. Now that we have disposed of the pending motions, we see no basis for any party to refuse to engage in discovery or its other obligations under the Federal Rules of Civil Procedure. We deny WesternGeco's motion to compel as moot.

### IV.      CONCLUSION

WesternGeco's Motion for Partial Reconsideration Regarding EEZ (Doc. No. 149) is **DENIED**. The Motion to Dismiss WesternGeco's Amended Complaint by the Fugro Defendants Pursuant to Rule 12(b)(6) (Doc. No. 148) is **GRANTED IN PART** and **DENIED IN PART**:

1. To the extent the motion seeks dismissal of claims of direct infringement under 35 U.S.C. § 271(a) based upon the Fugro Defendants' acts located in or upon Statoil's lease holdings in the Chukchi Sea and the Fugro Defendants' acts located in or upon the United States' Exclusive Economic Zone in the Gulf of Mexico, the motion is **GRANTED**.

2. In all other respects, the motion is **DENIED**.

WesternGeco's Motion to Strike Fugro's Second Motion to Dismiss and For an Expedited Response (Doc. No. 150) is **DENIED.** WesternGeco's Motion to Compel Fugro's Initial Disclosures, Discovery and Answer (Doc. No. 163) is **DENIED AS MOOT**.

The Fugro Defendants must file initial disclosures and an answer to WesternGeco's within ten days of this order. Within ten days of this order, the parties should submit a joint proposed docket control order containing proposed deadlines as well as a proposed trial date no later than June 2012. If the parties cannot agree on a joint docket control order, they should contact the Court's case manager to set a status conference in this case.

**IT IS SO ORDERED**.

**SIGNED** this the 15th day of August, 2011 in Houston, Texas.


_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE