UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **WESTERNGECO LLC,** *et al*, | § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. 4:09-CV-1827 |
| **ION GEOPHYSICAL CORPORATION,** *et al*, | § § § § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Pending before the Court is WesternGeco L.L.C.'s Motion for Supplemental Damages (Doc. No. 636), ION Geophysical Corporation's Motion to Compel (Doc. No. 658), and WesternGeco L.L.C.'s Motion to Strike (Doc. No. 659). After considering the motions, all responses thereto, and the applicable law, the Court finds that WesternGeco L.L.C.'s Motion for Supplemental Damages must be **GRANTED**. WesternGeco L.L.C.'s Motion to Strike must be **DENIED** and ION Geophysical Corporation's Motion to Compel must be **GRANTED**.

### I.     BACKGROUND

This is a patent infringement case originally brought by WesternGeco L.L.C. ("WesternGeco") against ION Geophysical Corporation ("ION"). WesternGeco alleged that ION had infringed certain claims of U.S. Patent Nos. 7,293,520 (the "'520 Patent"), 7,162,967 (the "'967 Patent"), 7,080,607 (the "'607 Patent"), and 6,691,038 (the "'038 Patent"). These patents all pertain to streamer positioning devices used in marine seismic surveys. Streamers, essentially long cables deployed behind boats, create three-dimensional maps of the subsurface of the ocean floor with acoustic signals and sensors. Streamer positioning devices control the position of the streamer as it is towed in order to achieve optimal imagery from the signals and to

1

maneuver around obstacles.

In a ruling on a summary judgment motion on June 29, 2012, the Court decided that ION had infringed claim 18 of WesternGeco's '520 Patent under 35 U.S.C. § 271(f)(1). (Doc. No. 372.) On August 16, 2012, the jury returned a verdict in favor of WesternGeco after finding that ION infringed claim 18 of the '520 Patent under Section 271(f)(2); claim 19 and claim 23 of the '520 Patent under Section 271(f)(1) and (f)(2); claim 15 of the '967 Patent under Section 271(f)(1) and (f)(2); claim 15 of the '607 Patent under Section 271(f)(1) and (f)(2); and claim 14 of the '038 Patent under Section 271(f)(1) and (f)(2). The jury did not find anticipation or non-enablement of the '520 Patent or the '967 Patent, nor anticipation, obviousness or non-enablement of the '607 or the '038 Patent. The jury found that ION willfully infringed. The jury awarded WesternGeco $93,400,000 in lost profits and $12,500,000 as reasonable royalty. (Doc. No. 536.)

ION's CEO, Robert Peebler, testified under oath at trial that ION stopped selling the DigiFIN after the Court's June 29, 2012 entry of summary judgment. On February 21, 2013, ION admitted that ION Dubai, a foreign subsidiary, had in fact continued sales. (*See* Doc No. 634 at 38.) Based on this information, the Court ordered ION to submit post-trial accounting, which revealed that "[t]he last sales information provided to [WesternGeco] prior to trial was for sales *through May 2011*." (Doc. No. 620 at 3 (emphasis in original.))[1] In its post-trial accounting, ION identified 1,353 sales since May 2011, some of which occurred before trial but were not presented to the jury and some of which occurred after trial. (*Id.* at 5-6.) The Court found that WesternGeco was entitled to supplemental damages for sales since May 2011, and ordered briefing. (Doc. No. 634 at 39.)

---

[1] ION later amended this statement and alleged that the last update was provided in May, 2012 rather than May, 2011. ION claimed that WesternGeco had nevertheless chosen to not include any sales data since May, 2011 in its presentation at trial. (Doc. No. 644 at 1 & n.1.)

2

## II. SUPPLEMENTAL DAMAGES

To assess supplemental damages, the Court must resolve (1) how many additional units infringed WesternGeco's patents, (2) how to apply the jury's award to those units, and (3) whether to impose an enhancement for willful conduct.

### A. Additional Infringement

ION's liability for any additional infringement must satisfy the requirements of 35 U.S.C. § 271(f)(1) or (f)(2). Section 271(f) of the Patent Act provides a limited exception to the general rule that United States patent law has no application outside of the United States. *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 441 (2007). Prior to this legislation, a manufacturer could escape liability by manufacturing the components of a patented product here, but then shipping the components overseas to be assembled beyond the reach of United States patent laws. *See Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1972); *Microsoft*, 550 U.S. at 442-45. Responding to this "loophole," Congress enacted Section 271(f) in 1984. *Pellegrini v. Analog Devices, Inc.*, 375 F.3d 1113, 1116 (Fed. Cir. 2004).

Section 271(f) imposes liability on manufacturers who supply a patented invention's components abroad. *Microsoft*, 550 U.S. at 444-45. Specifically, Section 271(f) imposes liability on:

> (1) Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States… [and]
>
> (2) Whoever without authority supplies or causes to be supplied in or from the United States any component of a patented invention that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use, where such component is uncombined in whole or in part, knowing that such component is so made or adapted and intending

> that such component will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States . . .

35 U.S.C. § 271(f). The differences between the two sections are subtle. *See T.D. Williamson, Inc. v. Laymon*, 723 F.Supp. 587, 592 (N.D. Okla. 1989) (citing the legislative history). Section 271(f)(1) requires a manufacturer to supply "all or a substantial portion of the components," whereas the supply of "any component" satisfies Section 271(f)(2) so long as it is "especially made or especially adapted for use in the invention." The two sections also require different mental states. A prior Order explained the difference between "actively induc[ing]" and "intending" the combination of components while "knowing" the components are especially suited for use in the patented invention. (*See* Doc. No. 372.)

In this case, the parties agree on ION's liability for 1,140 DigiFIN units, but another 617 units remain in dispute. These DigiFIN units can be subdivided into two helpful categories – those that were manufactured in the United States and those that were manufactured in Dubai.

### 1. DigiFINs Manufactured in the United States

ION sold and delivered 1,014 finished DigiFIN units prior to this Court's entry of summary judgment that were nevertheless not included in the jury award. ION concedes liability for these units. (Doc. No. 644 at 11.)

In addition, ION shipped 483 finished DigiFIN units to itself in Norway on July 6, 2012. (Doc. No. 620 at 9.) ION transferred the DigiFIN units once more in September – this time to its facility in Dubai. (*Id.* at 10.) From Dubai, ION shipped 126 of these units to SOPGC, a buyer in China, according to a pre-existing contract. (*Id.*) After relocation, ION entered into a contract with BGP, another foreign buyer, for 70 units. (*Id.* at 11.) The remaining 287 units sit, unsold, in a warehouse in Dubai.[2] (Doc. No. 644 at 5.) ION concedes that supplemental damages

---

[2] WesternGeco offered not to pursue supplemental damages on these 287 units if ION agreed to destroy them. (Doc.

4

should be assessed for the 126 units transferred to Dubai in anticipation of a sale to SOPGC, but contests the imposition of any liability for the 70 units sold abroad and the 287 units that remain unsold. (*Id.* at 12-13.)

ION argues that Section 271(f) is inapplicable to the finished units shipped abroad without a buyer in mind. Section 271(f), according to ION, requires "a specific intent to supply goods to be combined, by another," as judged at the time of export. (Doc. No. 644 at 16.) As such, "there is no liability for supplying with the intent for components to be combined until there is a shipment to the buyer who will combine the parts." (Doc. No. 620 at 11; *see also* Doc. No. 644 at 16.) Except for the 126 units sold to SOPGC, the finished DigiFIN units "were not destined for or committed to any customer" when they were relocated. (Doc. No. 620 at 12.) ION alleges that its only immediate intent was to warehouse, not combine, the DigiFIN units. (Doc. No. 644 at 16.) ION argues that any "hope" for a future sale falls short of the specific intent required under Section 271(f) at the time of export. (Doc. No. 644 at 16-17.) An overseas sale made after relocation, such as that which committed 70 units to BGP, would then be entirely extraterritorial: "This contract was entered into by ION S.à r.l outside of the United States, for inventory that was at the time outside of the United States (and not previously committed for sale), to a buyer for delivery outside of the United States." (*Id.* at 13.) As such, ION claims that supplemental damages cannot be imposed for the relocation of inventory or the subsequent overseas sale. (*Id.* at 16-18.)

ION has misinterpreted Section 271(f) to require the components to be supplied abroad pursuant to a contemporaneous sale. The plain language of Section 271(f)(2) requires only that the defendant supply a component, especially made for the patented invention, with the intent for

---

No. 636 at 10 n.3.) Since ION refused to do so (Doc. No. 644 at 16 n.7), this Court must determine ION's liability.

overseas combination.[3]  An exportation, rather than a sale, suffices.  In *Pellegrini v. Analog Devices, Inc.*, the Federal Circuit found that "the language of § 271(f) clearly contemplates that there must be an intervening sale *or exportation*." 375 F.3d at 1117 (emphasis added).  In his dissenting opinion in *Microsoft Corporation v. AT&T Corporation*, Justice Stevens considered the application of Section 271(f)(2) to an exportation of components:

> Under [Section 271(f)(2)], the export of a specially designed knife that has no use other than as a part of a patented deveining machine would constitute infringement.  It follows that § 271(f)(2) would cover the export of an inventory of such knives to be warehoused until used to complete the assembly of an infringing machine.

550 U.S. at 463 (Stevens, J., dissenting).  The majority changed the facts of Justice Stevens' explanation slightly to warehousing copies of the knife, but did not disagree with the premise that Section 271(f)(2) could be satisfied by the "export of an inventory of [components] to be warehoused." *Id*. at 453 n.15.

ION is therefore liable under Section 271(f)(2) for its supply of finished DigiFINs to Dubai to be warehoused until a later sale.  The DigiFINs were manufactured in the United States and shipped abroad with the admitted "hope" of eventual sale.  (*See* Doc. No. 620 at 7, 12.)  ION's plan to warehouse the units first does not relieve the company of liability.  Nor does the fact that some of the units remain unsold.  The Federal Circuit made clear that "[a] party can intend that a shipped component will ultimately be included in an assembled product even if the combination never occurs." *Waymark Corp. v. Porta Sys. Corp.*, 245 F.3d 1364, 1368 (Fed. Cir. 2001).  ION's intent to warehouse the exported DigiFINs until later sale satisfies the requirements for liability under Section 271(f)(2).

---

[3] Since a finding of liability under Section 271(f)(2) is sufficient for the imposition of supplemental damages, the Court does not reach the question of whether ION's actions establish liability under Section 271(f)(1) as well.

### 2. DigiFINs Manufactured in Dubai from American Parts

Another 260 units were manufactured, to some degree, in Dubai and subsequently sold to Turkey and Cyprus.[4] ION claims that these DigiFINs were manufactured and sold overseas, beyond the reach of United States patent laws. (Doc. No. 644 at 18.) ION admits, however, that these units were made in Dubai from parts, "all of [which] directly or indirectly came from the United States." (*Id.* at 13.) Some of these parts were common to other non-infringing products, while some were unique to the DigiFIN. (*Id.*) None of these parts, according to ION, satisfies the "substantial portion" language of Section 271(f)(1) or the "component" language of Section 271(f)(2). (*Id.* at 20.) ION argues that WesternGeco cannot recover damages for these units since the supply of these parts did not constitute an act of infringement. (*Id.*)

WesternGeco disagrees. First, WesternGeco disputes the evidence of overseas manufacturing: "[n]o credible evidence exists that ION has actually moved its manufacturing to Dubai." (Doc. No. 649 at 4.) WesternGeco points, for example, to ION's own admission on March 1, 2013 that its facility in Dubai "is presently being renovated to permit the manufacture of DigiFINs," suggesting that the facility is not operational. (Doc. No. 620 at 9; Doc. No. 636 at 7.) Second, WesternGeco argues that ION's actions constitute infringement even if the finished DigiFINs are manufactured in Dubai. (Doc. No. 649 at 5.) WesternGeco claims that ION "merely accelerated its supply to predate its sale contracts." (*Id.* at 6.) ION continues to infringe since it "supplied all of the components for its newest DigiFIN from the United States, including components 'unique to the device.'" (*Id.*)

Based on the jury's findings, as well as ION's own admissions, liability is proper for the shipment of parts from the United States that are unique to the DigiFIN. Under Section

---

[4] WesternGeco's original Motion for Supplemental Damages included 200 units manufactured abroad. (Doc. No. 636 at 10.) WesternGeco's reply, dated July 29, 2013, increased this number to 260 units based on an ION disclosure of July 26, 2013. (Doc. No. 649 at 4.)

271(f)(2), ION is liable for "*any* component . . . that is especially made or especially adapted for use in the invention." 35 U.S.C. § 271(f)(2) (emphasis added). A component is "a constituent part, element or ingredient" of the patented invention. *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1363 (Fed. Cir. 2009) (internal quotation marks omitted). ION acknowledges that at least two parts that it ships from the United States – the "ASSY PC DIGIFIN CONTROLLER" and the yellow plastic wings – are unique to the DigiFIN. (Doc. No. 651-1 at 4.) ION does not dispute, and the jury must have found, that the DigiFIN is especially made or especially adapted for use in WesternGeco's patented invention. (*See* Doc. No. 634 at 21.) Parts unique to the DigiFIN must therefore be components especially made or especially adapted for use in the patented invention. As such, the supply of parts unique to the DigiFIN from the United States violates Section 271(f)(2).

### B. Calculation of Damages

Supplemental damages for ION's continued infringement must be calculated consistently with the jury's verdict. *See Apple, Inc. v. Samsung Elec. Co., Ltd*., 926 F. Supp. 2d 1100, 1106 (N.D. Cal. 2013). In this case, the jury awarded WesternGeco $93,400,000 for lost profits and $12,500,000 as reasonable royalty for 2,547 infringing DigiFINs. (Doc. No. 536 at 8.) The parties disagree over how to calculate the relevant rate of damages to be applied to the additional units of infringement. WesternGeco argues that the Court should use the ratio of the total damages to sales, totaling $41,578 per DigiFIN. (Doc. No. 636 at 11.) ION argues that the Court should use the ratio of the reasonable royalty award to sales, totaling $4,907.73 per unit. (Doc. No. 644 at 21.)

ION's proposed solution of considering only the reasonable royalty would insufficiently compensate WesternGeco. Section 284 mandates "damages adequate to compensate for the

infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. Not only does ION's ratio ignore completely the jury's finding of lost profits for some acts of infringement, but it dilutes the rate of reasonable royalty by improperly assuming its application to all 2,547 units.

The Court finds that using the total amount of damages is more consistent with the jury's award. WesternGeco's approach of taking the average of the damages assessed by the jury (Doc. No. 649 at 7) is reasonable since the jury awarded lost profits for some acts of infringement and reasonable royalty for others (*see* Doc. No. 530 at 24). Most courts confronting supplemental damages are faced with only one form of damages. *See, e.g.*, *August Tech. Corp. v. Camtek, Ltd.*, 2010 WL 5560088 at *3-4 (D. Minn. Nov. 17 2010) (lost profits); *Mondis Tech. Ltd. v. Chimei InnoLux Corp.*, 822 F. Supp. 2d 639, 643 (E.D. Tex. 2011) (royalty rate); *Stryker Corp. v. Davol, Inc.*, 75 F. Supp. 2d 746, 747 (W.D. Mich. 1999) (royalty rate); *Apple*, 926 F. Supp. 2d at 1106 (lost profit or reasonable royalty depending on the product). In this case, the Court must extrapolate the jury's award of lost profit damages and reasonable royalty to ensure consistency with the jury's verdict and adequate compensation for WesternGeco. The jury's award of $105,900,000 for 2,547 DigiFIN units suggests a reasonable supplemental damages award of $73,052,546 for 1,757 additional units.

### C.  Enhancement for Willful Violation

WesternGeco requests enhanced damages based on ION's continued infringement. In a prior Order, this Court refused to impose enhanced damages after finding that ION reasonably relied on defenses presented at trial. (Doc. No. 634 at 24-28.) WesternGeco highlights 396 DigiFINs that were sold after the verdict – 126 units sold post-verdict to SOPGC, 70 units sold post-verdict to BGP, and 200 (now 260) units manufactured in Dubai from American parts and

9

sold post-verdict – for which it requests treble damages. (Doc. No. 636 at 9, 10, 15.) WesternGeco argues that ION was objectively reckless when it continued to infringe after the jury's verdict against it. (Doc. No. 636 at 14.)

To prove objective recklessness, WesternGeco must show by clear and convincing evidence that "[ION] acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assoc., Inc.*, 682 F.3d 1003, 1005 (Fed. Cir. 2012). As discussed above, ION's liability under Section 271(f) for these additional units arose when it supplied components abroad with the intent of future combination. When examining ION's recklessness, the Court therefore considers the timing of the export rather than the timing of the sale.

ION exported all of the finished DigiFIN units in July 2012, after the summary judgment order but prior to the verdict. (Doc. No. 620 at 9.) At exportation, ION reasonably relied on the defenses that it would later present to the jury. (*See* Doc. No. 634 at 24-28.) The only question is whether its actions were objectively reckless on the heels of the Court's summary judgment ruling that it had infringed claim 18 of the '520 patent. (*See* Doc. No. 372.) ION's export of 70 units, subsequently sold to BGP, was not objectively reckless. ION reasonably relied on its argument that the relocation of inventory abroad, without a committed buyer in mind, is not an infringement. Although mistaken, this argument is not unreasonable. ION's export of 126 units, subsequently delivered to SOPGC pursuant to a pre-existing contract, is more troubling to the Court. ION noted the arguments that it would have made but for their litigation decision to concede liability: "ION took the position it would not argue either that these units sold by ION INTERNATIONAL or their movement outside of the United States as part of ION INTERNATIONAL's overall inventory relocation exempted them from an accounting." (Doc.

10

No. 626 at 3.) The Court finds that these arguments are not objectively unreasonable in light of the summary judgment order.

ION exported DigiFIN parts before and after the verdict. (*See* Doc. No. 623-3.) Neither the summary judgment order nor the verdict considered the supply of parts, rather than finished DigiFIN units. The Court now decides that the supply of parts unique to the DigiFIN satisfies Section 271(f)(2)'s requirements, but ION's contrary belief was not objectively baseless. As such, the shipment of unique DigiFIN parts after the verdict also does not support enhanced damages.

### III. PERMANENT INJUNCTION

In light of the circumstances necessitating this Order, WesternGeco requests that the Court clarify the existing permanent injunction. The Court issued a permanent injunction in this case on June 19, 2013 based on the revelation after trial that ION continued to make and sell DigiFIN units. (Doc. No. 634 at 46.) The Court found that the "deeply troubling" misstatements at trial, the shipment of inventory abroad, and the SOPGC sale after trial weighed in favor of a permanent injunction. (*Id.*) WesternGeco now asks that the Court clarify that the injunction applies to "ION's supply of DigiFIN components from the United States for assembly abroad" in order to target ION's current practice of shipping DigiFIN parts to Dubai for manufacture and sale. (Doc. No. 636 at 16.) As explained above, the supply abroad of parts unique to the DigiFIN with the intent for future combination is an infringement under Section 271(f)(2). As such, ION's supply of parts unique to the DigiFIN from the United States is hereby enjoined.

### IV. MOTION TO COMPEL

WesternGeco brought a separate lawsuit against one of ION's customers, Polarcus, for infringing the same patents at issue in this case. (Doc. No. 658, Ex. A.) WesternGeco alleged

11

that Polarcus "executed a fleet-wide contract with ION for streamer positioning and control systems including ION's DigiFIN and Lateral Controller." (*Id.* at 6.) The parties settled the case on October 3, 2013, by agreeing to a $40 million license fee. (Doc. No. 658, Ex. B.) ███████

███████████████████████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████ ION moves to compel production of the complete agreement. (Doc. No. 658.) WesternGeco moves to strike ION's Motion to Compel as repetitive of a prior post-trial motion. (Doc. No. 659.)

The Court finds that ION's present Motion to Compel is distinct from its prior Motion to Compel. (*Compare* Doc. No. 609 *with* Doc. No. 658.) The two motions sought different documents pursuant to different rationales. Although the prior Motion to Compel was denied (Doc. No. 634 at 44), the Court considers the present Motion on its own merits. As such, WesternGeco's Motion to Strike is denied.

ION argues that the Polarcus agreement should be discoverable as relevant to the number of infringing units. (Doc. No. 658 at 5.) Polarcus bought DigiFINs and Lateral Controllers from ION. (Doc. No. 658, Ex. A at 6.) In its complaint against Polarcus, WesternGeco claimed that it "was not compensated for *some* or all of [Polarcus's] infringement as a result of the ION litigation." (*Id.* at 7 (emphasis added.)) ION highlights the potential overlap between infringements covered by the ION verdict and the Polarcus agreement: "It appears from public information that WesternGeco is likely getting a double recovery in some respect because its

license to Polarcus ultimately resolved a lawsuit over the same devices and same patent claims at issue here."  (Doc. No. 660 at 3.)  ███████████████████████████████████

███████████████████████████████████████████████████████████████████

███  The Court agrees with ION that the effect of the agreement on the number of infringing units is far from clear and warrants discovery.

While the agreement is relevant to the number of DigiFINs requiring supplemental damages, it is not relevant to the rate of supplemental damages.  ION argues that "the Polarcus license is directly relevant to WesternGeco's request for supplemental damages, both for the number of DigiFINs subject to royalties, *as well as the rate*."  (Doc. No. 658 at 5 (emphasis in original.))  To the contrary, the Court's assessment of supplemental damages applies the known jury verdict to the number of additional infringing units.  The agreement has no relevance in this calculation beyond determining the number of units that warrant supplemental damages.

Accordingly, the Court orders production of the Polarcus agreement to outside counsel by Tuesday, October 29, 2013, for the limited purpose of determining whether the agreement includes a past release for infringements adjudicated at trial or included in the base for supplemental damages.  ION must file any motion for a credit or remittitur, if necessary, within seven days of production.  WesternGeco's response will be due seven days after the submission of ION's motion.

### CONCLUSION

ION's supply of an additional 1,757 infringing DigiFIN units from the United States, as both its finished form and its essential components, infringed WesternGeco's patents.  These acts of infringement were not before the jury, and require supplemental damages consistent with the jury's verdict.  The Court hereby awards WesternGeco $73,052,546 in supplemental damages.

In addition, the Court clarifies that the permanent injunction applies with equal force to the supply of parts unique to the DigiFIN as to the supply of finished DigiFIN units. Lastly, WesternGeco's Motion to Strike ION's Motion to Compel is denied. ION's Motion to Compel is granted for the limited purpose of determining if the agreement includes a past release for infringements already adjudicated at trial or included in the base for supplemental damages.

    **IT IS SO ORDERED.**

    **SIGNED** at Houston, Texas, on this the 24th day of October, 2013.

_/s/ Keith P. Ellison_

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE